STUART, Justice.
Galt Industries, Inc. (“Galt”), a now defunct manufacturer of molded plastic parts located in Lee County, its president Jerry Plath (“Plath”), his wife and former Galt employee Danette Plath (“Danette”), and The Genesis Group, L.L.C. (“Genesis”), a company that markets and represents small and medium-sized businesses, sued Aegis Strategic Investment Corporation (“Aegis”), its sole shareholder, Mark Heisz, assorted other companies allegedly controlled by Heisz, including Stratford Plastic Components Alabama, Inc. (“SPC-Alabama”), and various employees of those companies in the Lee Circuit Court after SPC-Alabama acquired Galt by way of an asset-purchase agreement and then, approximately nine months later, ceased manufacturing operations and failed to fulfill certain terms of the asset-purchase agreement. Following a jury trial, the trial court entered a judgment awarding *920 the plaintiffs in excess of $824,000 and holding the defendants remaining in the action jointly and severally liable for those damages. Heisz and Aegis now appeal. We reverse and remand.
I.
In approximately November 2007, Plath decided to explore selling Galt after rising petroleum costs began eroding the company’s profitability. Toward that end, he contacted Genesis to see if it could procure a buyer. Genesis began marketing the company and thereafter received an inquiry from Aegis, a Canadian corporation. Aegis’s president, Heisz, was also the president of Stratford Plastic Components, LLC, an Ohio corporation (“SPC-Ohio”), and Stratford Plastic Components Corp., a Canadian corporation (“SPC-Ontario”), both of which manufactured plastic parts for automotive manufacturers in Ohio and Ontario, respectively. Heisz was interested in pursuing opportunities in Alabama based on Alabama’s growing presence in the automotive-manufacturing industry. However, after Aegis indicated that it viewed the fair market value of Galt as being approximately $3,000,000, well short of the $5,000,000 asking price, negotiations were terminated.
In approximately July 2008, Plath decided that the need to sell Galt was more urgent because rising supply costs were now threatening not only Galt’s profitability but also its viability. Plath discussed with Genesis his need to sell Galt and Genesis then reinitiated contact with Aegis to determine if it was still interested in purchasing Galt. On August 19, 2008, Aegis made an nonbinding proposal to have it or one of its subsidiaries or affiliates purchase certain Galt assets at a price to be finalized after an examination of Galt’s financial condition; Plath accepted the offer on behalf of Galt the next day. The proposal contemplated a 10-day period in which Aegis could conduct a due-diligence investigation; however, at the expiration of that period no firm agreement had been reached, and Aegis continued its review of Galt while Gait’s financial status continued to deteriorate.
By early September 2008, Galt was out of money and could not continue operations. On September 11, 2008, in order to prevent Galt from losing its customers, employees, and any remaining value, Galt and SPC-Alabama, which was formed that day, entered into an interim agreement setting forth the basic parameters of a future asset sale and providing that SPC-Alabama would immediately begin providing the raw materials Galt would use to manufacture finished products and to fulfill orders it already had and that SPC-Alabama would receive all revenues from the sale of those products. In return, the interim agreement provided that “[SPC-Alabama] shall pay a license fee to [Galt] for the use of the premises in the amount of $12,000 plus applicable taxes weekly, in arrears on the Monday following a complete week after proper invoice from [Galt] and subject to setoff ....” Heisz signed the interim agreement in his capacity as president of SPC-Alabama.
In the interval between the signing of the interim agreement on September 11, 2008, and the signing of the final asset-purchase agreement on January 16, 2009, Galt continued its operations, manufacturing products on behalf of SPC-Alabama, while SPC-Alabama continued its due-diligence review and negotiated with lenders and Galt’s creditors. One of those creditors included Galt’s landlord, and, after the parties were unable to resolve a dispute concerning past rent, SPC-Alabama instead expended approximately $500,000 to prepare and then move the operations to a new facility in Auburn. It appears that *921 SPC-Ohio provided funds and operational support for the Galt/SPC-Alabama operations during this time, and revenue received from the sale of products manufactured and sold pursuant to the interim agreement was also steered to SPC-Ohio. SPC-Ohio paid Galt a total of $20,000 in license fees during this period, the only-license fees Galt would receive.
In mid-January 2009, as Galt and SPC-Alabama neared an agreement on the final terms of the asset sale, a dispute arose regarding the amount of license fees Galt was owed. The parties had operated under the interim agreement for 17 weeks, and Galt claimed that it was still owed approximately $117,000 in license fees, while SPC-Alabama claimed that it had expended so much money paying Galt’s expenses and debts during those 17 weeks that no more money was owed. Galt evinced a willingness to settle for approximately $50,000; however, SPC-Alabama was unwilling to negotiate on the issue. On January 15, 2009, Heisz sent Plath the following e-mail message:
“I have reached my limit. [SPC-Alabama] has met and exceeded its obligations under the interim agreement. I am not paying your lawyer or accountants — I have agreed to pay reasonable legal [fee]s [stemming from Galt’s dispute with its landlord].
“[SPC-Alabama] has lost a lot of money in order to retain some value with customers who were universally pissed and were all owed tools by [Galt] which could not be satisfied by [Galt].
“I have been very flexible in trying to help [Galt] and the current shareholders to realize some value. I will loan [Galt] money to wrap up but it is not a condition or part of this transaction. When we have closed with [Galt’s] lenders and you have a budget we will assist as discussed and add to the note.
“I cannot spend more time and money on this process. If you want the deal then you need to sign and close by tomorrow. After that we will start over.”
Plath ultimately acquiesced and, on January 16, 2009, after resolving some other minor issues, sent Heisz an e-mail message saying “Let’s get this done.”
On January 16, 2009, Galt and SPC-Alabama executed the final asset-purchase agreement whereby SPC-Alabama purchased substantially all of Galt’s assets. As consideration, SPC-Alabama paid Galt $10, agreed to pay Plath a commission based on sales for a limited period following the transaction, and agreed to assume certain liabilities owed by Galt. SPC-Alabama also agreed to indemnify Galt for the debt obligations it was assuming and to indemnify Plath and Danette for certain personal guarantees executed by them in connection with Galt’s debt. Finally, SPC-Alabama also agreed to employ Plath and Danette post-closing and to pay Genesis a $50,000 brokerage fee for its role in facilitating the asset-purchase transaction. Section 1.3 of the asset-purchase agreement also contained a merger clause and a release that provided, in pertinent part:
“This agreement, including any schedules hereto together with any agreements and other documents to be delivered under this agreement constitute the entire agreement between the parties pertaining to the subject matter of this agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties and there are no warranties, representations or other agreements between the parties in connection with the subject matter of this agreement except as specifically set forth in this agreement.... Each of the parties hereto hereby remise and release the other and their respective *922 officers, directors, shareholders, employees and agents from any claims or causes of action that they or their respective officers, directors, shareholders, employees or agents may have against the other for any actions or failures to act as of the closing date; provided that the foregoing release in no way releases obligations under a separate bailment agreement between the parties, nor does it release any party from representations and warranties that are contemplated or given in this agreement or from any future actions of either party. ...”
The asset-purchase agreement was signed by Plath in his capacity as president of Galt and by Heisz in his capacity as president of SPC-Alabama. Plath also agreed to sell SPC-Alabama an air compressor that he personally owned for $15,000; this transaction was not covered by the asset-purchase agreement.
Following the close of the transaction, SPC-Alabama failed to generate sufficient revenue to cover its expenses, and SPC-Ohio continued to provide funds and support services for its operations. Poor economic conditions throughout the summer of 2009, including especially a slowdown in manufacturing by its automotive customers, resulted in a decrease in orders and an approximate 50% drop in revenue from the previous year, while changes in the credit market also made it difficult for SPC-Alabama to refinance equipment leases. In July 2009, the first of a series of creditors began filing lawsuits against Galt and its shareholders; however, SPC-Alabama was either unwilling or unable to provide the indemnity it had agreed to provide in the asset-purchase agreement. In September 2009, SPC-Alabama shut down its manufacturing operations in Alabama, and on September 11, 2009, Plath’s employment was terminated; Danette’s employment had previously been terminated at the conclusion of the 13 weeks SPC-Alabama had agreed to employ her.[1] When Plath subsequently requested commissions, reimbursements, and severance and vacation pay he claimed he was owed, Heisz informed him that SPC-Alabama would be unable to meet any of those obligations. SPC-Alabama likewise failed to pay Plath for the air compressor it had purchased or to pay Genesis the $50,000 brokerage fee it claimed.
On October 6, 2009, Galt, Plath, Danette, and Genesis filed this action alleging that Heisz, Aegis, SPC-Alabama, SPC-Ohio, SPC-Ontario,[2] and two other related companies, Stratford Plastics Corporation and Stratford Plastics U.S. Holding Corp., both Alabama corporations (with the exception of Aegis and SPC-Ontario, which was dismissed from the case before trial after filing for bankruptcy in Canada, all of these companies are hereinafter referred to collectively as “the Stratford companies”), as well as other individuals affiliated with the Stratford companies and/or Aegis were liable for breach of contract and fraud and seeking a judgment declaring (1) that the defendants were obligated to indemnify Galt, Plath, and Danette as set forth in the asset-purchase agreement and (2) that the plaintiffs were entitled to pierce SPC-Alabama’s corporate veil and *923 to hold the other defendants liable for any damages awards entered against it.[3]
The case ultimately proceeded to trial on August 9, 2010. At trial, none of the Stratford companies disputed the plaintiffs’ breach-of-contract claims, and the jury was accordingly charged simply with determining what damages should be assessed against them. Genesis, which had not alleged a fraud claim, was awarded $54,684 on its breach-of-contract claim. Before calculating damages to be awarded Galt, Plath, and Danette, however, the verdict form agreed to by the parties required the jury to first determine if it was reasonably satisfied that the Stratford companies were liable on the plaintiffs’ fraud claims. The jury noted on the verdict form that it did find the Stratford companies liable for fraud; however, it declined to award any punitive damages, awarding Galt $720,678 and Plath $48,893 in compensatory damages on their respective fraud and breach-of-contract claims. Danette was awarded nothing on her claims. The jury was also separately charged with making a finding as to whether Heisz and/or Aegis had fraudulently represented to the plaintiffs that SPC-Alabama and/or the Stratford companies intended to fulfill the terms of the asset-purchase agreement when in fact they had no intention of doing so; the jury also answered this inquiry in the affirmative. The trial court entered judgment on the jury’s verdict on August 19, 2010, ordering SPC-Alabama to pay Genesis $54,684, Galt $720,678, and Plath $48,893.
Thereafter, the plaintiffs, as well as Heisz and Aegis, filed postjudgment motions pursuant to Rule 59, Ala. R. Civ. P. The Stratford companies did not join in the motion filed by Heisz and Aegis. In their motion, the plaintiffs urged the trial court to amend its judgment to make it consistent with the jury’s verdict; specifically, to make all the defendants jointly and severally liable for the jury’s damages awards — not just SPC-Alabama — because the other Stratford companies had not contested the plaintiffs’ claims and because the jury had also found that Heisz and Aegis were liable for fraud. The plaintiffs also asked the trial court to declare that Plath, Danette, and Genesis were third-party beneficiaries of the asset-purchase agreement and to pierce the corporate veil of SPC-Alabama. In their motion, Heisz and Aegis moved the trial court to vacate the judgment entered on the jury’s verdict and to enter a judgment as a matter of law in their favor because, they alleged, for a variety of reasons the jury’s verdict was not supported by the substantial evidence.
On September 28, 2010, the trial court conducted a hearing on the parties’ post-judgment motions, and, on September 29, 2010, it entered an amended judgment holding (1) that all the defendants were jointly and severally liable for the damages awards entered in favor of Genesis, Galt, and Plath; (2) that Galt, Plath, and Dan-ette were entitled to the indemnity set forth in the asset-purchase agreement; and (3) that the plaintiffs were entitled to pierce the corporate veil of the defendant corporate entities. On November 10, 2010, Heisz and Aegis filed their notice of appeal to this Court.
II.
On appeal, Heisz and Aegis argue that each damages award entered by the trial court — $54,684 for Genesis, $720,678 for Galt, and $48,893 for Plath — should be reversed insofar as those awards were en *924 tered against them as opposed to the Stratford companies.[4] Heisz and Aegis’s liability for the damages award made to Genesis is based on the trial court’s finding that the corporate veils of the Stratford companies should be pierced; there was no evidence indicating that Heisz or Aegis individually breached a contract with Genesis. However, Heisz and Aegis’s liability for the damages awards made to Galt and Plath is based not only on piercing the corporate veils of the Stratford companies, but also on the specific findings of the jury that Heisz and Aegis had each made fraudulent misrepresentations to Galt and Plath. Heisz and Aegis now argue, among other things, that the plaintiffs failed to adduce substantial evidence at trial indicating that Heisz and Aegis were liable for fraud and that the trial court erred by ordering that the corporate veils of the Stratford companies be pierced. We accordingly consider these arguments in turn.[5]
Heisz and Aegis moved for a judgment as a matter of law at the close of the plaintiffs’ case and at the close of all the evidence, arguing that the plaintiffs had failed to submit evidence showing that Heisz and/or Aegis had committed fraud. Both times the trial court denied their motion, and they argue on appeal that the trial court erred to reversal by doing so. We have stated:
“When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id.”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003). The species of fraud Galt and Plath allege Heisz and Aegis committed is the type of fraud known as “promissory fraud”; specifically, Galt and Plath allege that Heisz and Aegis promised that SPC-Alabama would fulfill its obligations under *925 the asset-purchase agreement when they knew that it had no intention of doing so. We described promissory fraud as follows in Southland Bank v. A & A Drywall Supply Co., 21 So.3d 1196,1210 (Ala.2008):
“ ‘A claim of promissory fraud is “one based upon a promise to act or not to act in the future.” ’ Ex parte Michelin North America, Inc., 795 So.2d 674, 678 (Ala.2001) (quoting Padgett v. Hughes, 535 So.2d 140,142 (Ala.1988)).
“ ‘ “The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim ..., two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.” ’
“Michelin North America, 795 So.2d at 678-79 (quoting Padgett, 535 So.2d at 142).”
Heisz and Aegis argue that the plaintiffs failed to put forth substantial evidence at trial of the fifth element of a promissory-fraud claim: that Heisz and Aegis knew that SPC-Alabama would not fulfill its obligations under the asset-purchase agreement at the same time they were representing that it would in fact do so. For the reasons that follow, we agree.
The interrogatories submitted to the jury asked whether Heisz and/or Aegis had represented to the plaintiffs that SPC-Alabama or the other Stratford companies would “fulfill [SPC-Alabama’s] future obligations under the asset-purchase agreement” while knowing that SPC-Alabama intended not to fulfill those obligations. The plaintiffs argue that Heisz also made misrepresentations in the interim agreement and that Aegis employees made misrepresentations regarding Aegis’s financial capabilities in November 2007 when Aegis first began discussing purchasing Galt’s assets; however, those misrepresentations do not relate to the promissory-fraud claim submitted to the jury — whether Heisz and Aegis knowingly misrepresented that SPC-Alabama would fulfill its obligations under the asset-purchase agreement. Thus, the only alleged misrepresentations identified at trial that would support the promissory-fraud claim submitted to the jury are those made in the asset-purchase agreement itself, which was signed by Heisz.[6]
Although it is undisputed that SPC-Alabama did not fulfill its obligations under the asset-purchase agreement, that fact alone is insufficient to demonstrate that it never intended to do so. “[F]ailure to perform alone is not sufficient evidence to show a present intent not to perform. If it were, then every breach of contract would be ‘tantamount to fraud.’ ” Gadsden Paper & Supply Co. v. Washburn, 554 So.2d 983, 987 (Ala.1989) (citing and quoting Purcell Co. v. Spriggs Enters., Inc., 431 So.2d 515, 519 (Ala.1983)). Rather, there must be some evidence that would indicate a present intent not to perform, *926 even if that evidence is only circumstantial. See Byrd v. Lamar, 846 So.2d 334, 347 (Ala.2002) (“Circumstantial evidence is appropriate proof of a present intent not to perform in a promissory-fraud case.”), and Harrison v. Gibson, 534 So.2d 257, 259 (Ala.1988) (“Intent to deceive and intent not to perform at the time a promise is made can seldom be proven directly....”). However, the parties in the present case dispute what circumstantial evidence may be offered as proof of Heisz’s intent. Citing Vance v. Huff, 568 So.2d 745, 750 (Ala.1990), which provides that “[t]he defendant’s intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepi’esentations were made,” Heisz and Aegis argue that the plaintiffs can rely only on circumstantial evidence relating to events after the alleged representation to prove their fraud claim. The plaintiffs, however, argue that “can be” is not tantamount to “must be” and that circumstantial evidence relating to events predating the alleged misrepresentation may also be considered when determining whether there is substantial evidence showing that there was an intent not to perform at the time an obligation was incurred.
This Court has cited the above-quoted excerpt from Vance on multiple occasions but has not considered the question presented in this case. See, e.g., Southland Bank, 21 So.3d at 1212, and Byrd v. Lamar, 846 So.2d 334, 343 (Ala.2002). However, in Zielke v. AmSouth Bank, N.A., 703 So.2d 354 (Ala.Civ.App.1996), the Court of Civil Appeals did address this issue and held that the trial court properly excluded certain evidence meant to establish that the defendant had had the present intent to deceive when making a misrepresentation because the excluded evidence related to an event occurring before the alleged misrepresentation. Thus, Zielke appears to support the position now taken by Heisz and Aegis. However, in subsequent cases in which this Court has cited the at-issue principle from Vance, we have recognized that other types of circumstantial evidence can be probative in promissory-fraud cases. For example, in Southland Bank we stated:
“Evidence of consistent, but unfulfilled, promises can in some cases amount to substantial evidence of an intent to deceive. Goodyear Tire [& Rubber Co. v. Washington], 719 So.2d [774,] 777 [ (Ala.1998) ]; Campbell v. Naman’s Catering, Inc., 842 So.2d 654, 659 (Ala.2002). Additionally, ‘[a] defendant’s intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made.’ Byrd v. Lamar, 846 So.2d 334, 343 (Ala.2002).”
21 So.3d at 1212. The term “additionally” preceding the statement that “ ‘[a] defendant’s intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made’ ” is an explicit recognition that something other than that evidence can be used to establish the defendant’s intent to deceive. Thus, we agree with the plaintiffs that circumstantial evidence relevant to whether an individual had the present intent to deceive when making a misrepresentation need not be limited to events occurring after the alleged misrepresentation. To the extent Zielke states otherwise, it is overruled.
The plaintiffs argue that the following circumstantial evidence was presented at trial to indicate that Heisz misrepresented that SPC-Alabama would fulfill its obligations under the asset-purchase agreement:
*927 (1) Heisz never provided SPC-Alabama, before or after the execution of the asset-purchase agreement, with the financial capital to fulfill its obligations;
(2) After SPC-Alabama became involved in Galt’s operations subsequent to the signing of the interim agreement, Heisz indicated that he would not pay certain Galt creditors unless it was essential to continue the business relationship with them;
(3) After Plath requested a license-fee payment in October 2008, Heisz told an Aegis employee in an e-mail that “we need to get this figured out as [Plath] thinks that we are going to pay him way more than we are”;
(4) Heisz testified that SPC-Alabama was selective about which of Galt’s debts it would pay;
(5) Plath’s internal e-mail address was shown to be “oldandgone@spcc. com” on an e-mail he sent to a co-employee on January 29, 2009; and
(6) SPC-Alabama did not pay Genesis the brokerage fee that was due at closing under the terms of the asset-purchase agreement.
We disagree that these items constitute substantial evidence that Heisz intended for SPC-Alabama to breach the asset-purchase agreement even as he was signing it. Although SPC-Alabama was apparently not highly capitalized at its incorporation, it is undisputed that the other Stratford companies consistently transferred money to it or directly paid expenses on its behalf totaling in excess of $2 million. That sum includes at least one commission payment to Plath, salaries paid him and Danette according to their employment contracts, and some payments to lenders on equipment leases for which SPC-Alabama had agreed to indemnify the plaintiffs in the asset-purchase agreement. Moreover, although business was bad for Galt when Plath began trying to sell it in 2008, it apparently worsened after the asset sale, because the undisputed evidence at trial indicated that revenues decreased another 50% from 2008 to 2009 after SPC-Alabama purchased Galt’s assets and took over its operations. While the plasties-manufac-turing business was worsening, the credit markets were also tightening and Plath himself recognized in an e-mail sent to Heisz shortly after the asset-purchase agreement was executed that “every bank in North America is a pain to work with in the current environment.” It is undisputed that the credit financing Heisz expected SPC-Alabama to receive from outside lenders did not develop and SPC-Alabama was unable to refinance obligations or to obtain further funds for its operations. Eventually, SPC-Alabama closed its operations, followed later by both SPC-Ohio and SPC-Ontario.
This undisputed evidence is consistent with Heisz and Aegis’s assertion that SPC-Alabama breached its obligations under the asset-purchase agreement for financial reasons, not as part of a fraudulent scheme. The circumstantial evidence cited by Galt and Plath is insufficient as substantial evidence to the contrary. With regard to the specific circumstantial evidence advanced by Galt and Plath in support of their argument, the fact that Heisz indicated he did not want to pay some of Galt’s creditors during the period they were operating under the interim agreement has no bearing on the fraud claim submitted to the jury. SPC-Alabama had no obligation to pay Galt’s debts at that time, and SPC-Alabama presumably structured its deal with Galt as an asset purchase, as opposed to a simple merger or stock purchase, in order to avoid obligating *928 itself to pay Galt’s debts, other than those specifically enumerated in the asset-purchase agreement. Heisz and SPC-Alabama’s unwillingness to pay those debts does not indicate that SPC-Alabama never intended to fulfill its obligations under the asset-purchase agreement.
Likewise, the e-mail Heisz sent to a subordinate at Aegis indicating that they needed to figure things out because Plath thought he was entitled to more under the interim agreement than the defendants believed he was entitled to does not indicate a scheme to defraud Plath or Galt. Rather, it recognizes that the parties had different understandings of the interim agreement, a fact no one disputes and that was the subject of much discussion up to the time the asset-purchase agreement was finally executed.
With regard to SPC-Alabama’s financing, it is undisputed that SPC-Alabama was never profitable. It did produce some revenue, and the other Stratford companies provided it funds as well, but its revenues never covered its expenses. In light of its poor financial condition, the fact it was selective with regard to which debts to pay first cannot be taken as evidence that it never intended to fulfill its obligations under the asset-purchase agreement. To the contrary, it is undisputed that it did attempt to fulfill some of those obligations because it made some payments on equipment leases and even paid Plath’s salary up until September 2009, when it ceased manufacturing operations. Because Plath was paid for approximately eight months up until that time, one similarly cannot infer that SPC-Alabama never intended to fulfill its obligation to Plath merely because he was assigned the e-mail address “oldandgone@spcc.com.”
Finally, the fact that SPC-Alabama did not pay Genesis the brokerage fee it was owed under the asset-purchase agreement is not substantial evidence of fraud. As quoted supra, “failure to perform alone is not sufficient evidence to show a present intent not to perform.” Gadsden Paper & Supply Co., 554 So.2d at 987.
The law places a heavier burden upon the plaintiff in promissory-fraud cases than in ordinary fraud cases. National Sec. Ins. Co. v. Donaldson, 664 So.2d 871, 876 (Ala.1995). In this case, it is undisputed that Heisz, Aegis, and the Stratford companies invested a significant sum into the transaction with Galt — in excess of $2 million — and spent approximately $500,000 to move the manufacturing operations to a new facility in Auburn. It is also undisputed that SPC-Alabama’s revenues were cut in half during this time frame and that the prevailing economic conditions were such that it was unable to obtain further financing for its operations from outside sources. Moreover, after purchasing Galt’s assets, SPC-Alabama undisputedly made some payments to lenders on equipment leases for which SPC-Alabama had agreed to indemnify the plaintiffs, it fulfilled its employment obligations to Danette, and it paid Plath as agreed until it closed in September 2009. Considering all the evidence submitted at trial in the light most favorable to Galt and Plath, we cannot agree that “fair-minded persons in the exercise of impartial judgment” could reasonably conclude that SPC-Alabama failed to fulfill its obligations under the asset-purchase agreement as part of a fraudulent scheme as opposed to out of economic necessity. West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). See also Webb Wheel Prods., Inc. v. Hanvey, 922 So.2d 865, 875 (Ala.2005) (“Although we are to consider the evidence in the light most favorable to [Galt and Plath], as the nonmovant[s] for the [judgment as a matter of law], that fact does not *929 require us to consider only the evidence most favorable to [Galt and Plath] while excluding undisputed evidence favorable to [Heisz and Aegis].”). Accordingly, the trial court erred by submitting Galt and Plath’s fraud claims to the jury.
III.
However, notwithstanding the fact that there was insufficient evidence to submit Galt and Plath’s fraud claims to the jury, Heisz and Aegis would nevertheless be liable for the damages awards entered in favor of Galt and Plath, as well as the damages award entered in favor of Genesis, if the trial court’s ruling that the corporate veil of the Stratford companies should be pierced is upheld, because the Stratford companies have not disputed the judgments entered against them. Whether the corporate veil of a business entity should be pierced is a matter of equity, properly decided by a judge after a jury has resolved the accompanying legal issues. Stephens v. Fines Recycling, Inc., 84 So.3d 867, 877 (Ala.2011); Ex parte Thorn, 788 So.2d 140 (Ala.2000). We accordingly review a trial court’s determination in this regard under the ore tenus standard of review, which dictates that the trial court’s judgment based on ore tenus evidence “ ‘is presumed correct and should be reversed only if the judgment is found to be plainly and palpably wrong, after consideration of all the evidence and after drawing all inferences that can logically be drawn from that evidence.’ ” Thomas v. Neal, 600 So.2d 1000, 1001 (Ala.1992) (quoting Sundance Marina, Inc. v. Reach, 567 So.2d 1322,1324-25 (Ala.1990)).
As an initial matter, Galt and Plath dispute whether Heisz and Aegis can even challenge the trial court’s conclusion that the corporate veils of the Stratford companies should be pierced. They argue that Heisz and Aegis failed to submit a post-judgment motion raising this issue after the trial court entered its September 29, 2010, amended judgment and that the issue accordingly has been waived. Heisz and Aegis, however, argue that no such motion was required because the trial court entered written findings of fact on the issue. We discussed this same question in Ex parte Vaughn, 495 So.2d 83, 87 (Ala.1986), and stated:
“Rule 52(b)[, Ala. R. Civ. P.,] provides an exemption from the requirement of invoking a ruling by the trial court on the issue of evidentiary insufficiency when written findings of fact are made. The trial court’s ruling on the sufficiency of the evidence is implicit in a decree in which the trial judge is the trier of the facts. Moreover, by making written findings of fact, the trial judge has had the additional opportunity to reconsider the evidence and discover and correct any error in judgment which he or she may have made upon initial review. Thus, when written findings of fact are made, they serve the same useful purpose as does an objection to the trial court’s findings, a motion to amend them, a motion for a new trial, and a motion to dismiss under Rule 41(b), [Ala. R. Civ. P.] — to permit the trial judge an opportunity to carefully review the evidence and to perfect the issues for review on appeal.”
Thus, for the reasons set forth in Ex parte Vaughn, we hold that Heisz and Aegis have not waived the issue whether the evidence was sufficient to merit piercing the corporate veils of the Stratford companies.
In Messick v. Moring, 514 So.2d 892, 894 (Ala.1987), this Court set forth three theories under which a party might seek to pierce the veil of a corporate defendant: (1) inadequacy of capital; (2) fraudulent purpose in conception or operation of the *930 business; and (3) operation of the corporation as an instrumentality or alter ego. However, we have since stated that “[t]he fact that a corporation is under-capitalized is not alone sufficient to establish personal liability.” Simmons v. Clark Equip. Credit Corp., 554 So.2d 398, 400 (Ala.1989) (citing Co-Ex Plastics, Inc. v. AlaPak, Inc., 536 So.2d 37 (Ala.1988), and East End Mem’l Ass’n v. Egerman, 514 So.2d 38 (Ala.1987)). We also held in this case, as explained supra, that there is insufficient evidence to establish that SPC-Alabama was conceived and operated as part of a fraudulent scheme; accordingly, we must determine whether the trial court’s conclusion that the veils of the Stratford companies should be pierced is supported under the alter ego theory of liability.
In Messick, we enunciated the standard to be applied to determine whether to disregard the corporate entity under an alter ego theory of liability:
“In an attempt to circumvent some of the difficulties in applying conelusory terms such as ‘instrumentality,’ ‘alter ego’ and ‘adjunct,’ we announced, in Kwick Set Components, Inc. v. Davidson Ind., Inc., 411 So.2d 134 (Ala.1982), a standard to be applied in order to determine whether the corporate entity should be disregarded when excessive control is the ground. While acknowledging that the dominating party may be an individual or another corporation, we stated the elements essential for imposition of liability on the dominant party as follows:
“1) The dominant party must have complete control and domination of the subservient corporation’s finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;
“2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed;
“3) The misuse of this control must proximately cause the harm or unjust loss complained of.
“Lowendahl v. Baltimore & 0. Ry., 247 A.D. 144, 287 N.Y.S. 62 (1936).”
514 So.2d at 894-95. There was sufficient evidence introduced at trial from which the trial court could conclude that Heisz exercised complete control and domination over the Stratford companies and Aegis.[7] However, there still must be evidence that that control was misused before the corporate veil can be pierced. See Simmons, 554 So.2d at 400 (“[MJere domination cannot be enough for piercing the corporate veil. There must be the added elements of misuse of control and harm or loss resulting from it.”). Heisz and Aegis argue that any evidence of misuse is lacking. However, Galt and Plath argue that such evidence was in fact presented at trial:
“Plaintiffs presented evidence that both Aegis and Heisz misused the control they enjoyed. The trial court’s findings that Aegis was compensated for performing business functions for the *931 various corporate defendants under terms negotiated solely by Heisz belies the misuse of control exerted by Heisz over all of his companies. Evidence was presented to the trial court that Heisz wrote checks to Aegis from his other companies, and those cheeks totaled $52,000. Heisz also testified that a vast majority of the banking records he produced were illegible, and that there could be more checks made out to Aegis that at trial he was unable to read. From this evidence it is reasonable for the trial court to infer that additional payments were authorized by Heisz to Aegis, and that Heisz used his control over the finances of the various Strat-ford entities to benefit Aegis at his other companies’ expense.
“Furthermore, Heisz misused his control over the finances and policies of [SPC-Alabama]. In this regard, the trial court made a finding that Heisz directed proceeds from [SPC-Alabama’s] manufacturing operations be remitted to other companies under his control. This kept revenues from flowing directly into [SPC-Alabama], Instead of allowing [SPC-Alabama] to obtain the financial benefit of the products it produced, [SPC-Alabama] was kept cash poor. Instead of being a self-sufficient corporation able to meet its obligations as they became due, Heisz’s misuse of his control over [SPC-Alabama] rendered it unable to manage its liabilities. [SPC-Alabama] only received funds when Heisz authorized transfers into [SPC-Alabama]. Thus, the trial court’s findings that Heisz’s direction of production proceeds out of [SPC-Alabama] and into other corporations he controlled warrants deference.”
(Galt and Plath’s brief, pp. 67-68.) We disagree that the cited evidence indicates that Heisz misused his control over the Stratford companies and Aegis. The facts that Heisz negotiated the terms of transactions between Aegis and the Stratford companies and that he directed transfers between the companies is not itself evidence of misuse; rather, that evidence relates to the first element of the alter ego analysis — whether Heisz controlled the companies. We agree that there was evidence indicating that he did, but, again, “mere domination cannot be enough for piercing the corporate veil.” Simmons, 554 So.2d at 400. There must be some evidence indicating that those transactions were somehow unfair, fraudulent, or otherwise not legitimate. The $52,000 in payments identified by Galt and Plath as being made to Aegis by SPC-Ohio was, Heisz testified, paid as compensation for consulting services performed by Aegis. There is no evidence in the record indicating that those services were not, in fact, performed or that they were billed at an excessive rate.[8] Any conclusions that these, or some other transactions of which there is no evidence, are illegitimate would accordingly be the product of mere speculation, and speculation is an insufficient basis upon which to support a judgment. Systrends, Inc. v. Group 8760, LLC, 959 So.2d 1052,1074 (Ala.2006).
Moreover, the evidence does not support the conclusion that revenue was improperly drained out of or redirected from SPC-Alabama into other Stratford companies or Aegis. Although Galt and Plath are correct that the revenue received from the products SPC-Alabama sold was routed to SPC-Ohio, they fail to acknowledge the undisputed evidence indicating *932 that SPC-Ohio had also injected significant sums into SPC-Alabama to fund its operations and that the revenue received from those operations never exceeded those sums. Thus, although Heisz may have exercised control over and dominated the Stratford companies and Aegis, there was no evidence to indicate that he misused that control. Accordingly, the trial court’s judgment holding that the corporate veils of the Stratford companies and/or Aegis should be pierced was unsupported by the evidence and is due to be reversed.
IV.
Galt, Plath, Danette, and Genesis sued Heisz, Aegis, SPC-Alabama, and other associated companies and individuals, alleging breach of contract and fraud, after SPC-Alabama purchased substantially all of Galt’s assets but then ceased operations before it was able to fulfill all the terms of the asset-purchase agreement. Following a jury trial in which SPC-Alabama and the other Stratford companies conceded liability on the breach-of-contract claims, the jury returned a verdict finding the defendants liable for fraud as well and awarding Genesis $54,684 on its breach-of-contract claim, Galt $720,678 on its fraud and breach-of-contract claims, and Plath $48,893 on his fraud and breach-of-contract claims. The trial court then ordered that the corporate veils of the Stratford companies should be pierced and that all the defendants should be jointly and severally liable for those awards and entered judgment accordingly. Heisz and Aegis appealed, and we now reverse the judgment entered as it relates to them because there was insufficient evidence to indicate that they were liable for promissory fraud or to support piercing the corporate veils of the Stratford companies. We remand the cause for proceedings consistent with this opinion.
REVERSED AND REMANDED.
MALONE, C.J., and WOODALL, BOLIN, SHAW, MAIN, and WISE, JJ., concur.
PARKER, J., concurs in the result.
MURDOCK, J., dissents.

. Following the shutdown of operations in Alabama, SPC-Ohio commenced servicing some former Galt/SPC-Alabama customers from its base in Ohio; however, SPC-Ohio subsequently liquidated its assets in bankruptcy, and SPC-Ontario would eventually seek bankruptcy protection in Canada as well.

. SPC-Ontario was not named in the initial complaint but was substituted for a fictitiously named defendant in a subsequent amendment.

. All the individual defendants other than Heisz were dismissed from the case before trial.

. None of the Stratford companies appealed the trial court's judgment, and, accordingly, none of them are represented in these appellate proceedings.

. Heisz and Aegis also argue to this Court that the damages awards in favor of Galt and Plath should be reversed because, Heisz and Aegis argue, the release clause in the asset-purchase agreement encompassed at least some of the claims pursued by Galt and Plath at trial, e.g., whether additional license fees were still owed. Galt and Plath, however, argue that the release should not be given effect because it was procured by fraud or coercion. Because an analysis of whether the release should have barred some of Galt's and Plath's claims would therefore also require us to review the fraud issue, we have elected to address the fraud issue directly instead. Our conclusions in that regard make it unnecessary to further consider the issue whether the release should have been given effect.

. Heisz and Aegis argue on appeal that they made no representations in the asset-purchase agreement that could support a fraud claim because Heisz executed the agreement only in his capacity as the president of SPC-Alabama. The plaintiffs, however, argue (1) that Heisz and Aegis waived this specific argument because it was not presented to the trial court in a posttrial motion and (2) that Heisz would be liable for the alleged fraud regardless of the capacity in which he executed the asset-purchase agreement. However, because we conclude that there is not substantial evidence of at least one other element of a promissory-fraud claim, it is unnecessary to consider these arguments.

. Heisz and Aegis argue that the plaintiffs were also required to show that Heisz and/or Aegis had ownership interests in the Stratford companies before the corporate veils could be pierced and that no such evidence was presented at trial. Galt and Plath, however, argue that evidence of an ownership interest is not required to establish control and domination. Because we conclude that there was insufficient evidence to merit piercing the corporate veils of the Stratford companies for other reasons, we need not address this issue.

. Heisz and Aegis note that the $52,000 in consulting fees paid to Aegis by SPC-Ohio is roughly equal to the $50,000 claimed by Genesis for its work on the Galt-SPC-Alabama transaction.