MAIN, Justice
(concurring in part and dissenting in part).
I concur in the main opinion’s conclusion that the judgment appealed from was a final judgment and in its affirmance of the trial court’s order denying Target Media’s postjudgment motion for a judgment as a matter of law (“JML”) as to Specialty Marketing Corporation’s breach-of-contract claim. However, I respectfully dissent from the main opinion’s affirmance of the trial court’s order denying Target Media Partners Operating Company, LLC (“Target Media”), and Ed Leader’s post-judgment motion for a judgment as to Specialty Marketing’s fraudulent-misrepresentation claim and its promissory-fraud claim. I would reverse the trial court’s order as to those claims and remand the case for the trial court to enter a JML in favor of Target Media and Leader as to Specialty Marketing’s fraudulent-misrepresentation claim and promissory-fraud claim.
A. Fraudulent Misrepresentation
I find persuasive Target Media’s argument that Specialty Marketing’s reliance upon the representations made by Target Media and Leader was unreasonable as a matter of law. In order to prove a claim of fraudulent misrepresentation, Specialty Marketing needed to establish “(1) that [Target Media and Leader] made a false representation, (2) that the misrepresentation involved a material fact, (3) that [Specialty Marketing] relied on the misrepresentation, and (4) that the misrepresentation damaged [Specialty Marketing].” *872 AmerUs Life Ins. Co. v. Smith, 5 So.3d 1200, 1207 (Ala.2008). This Court has held that “for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that' is, that he took a different course of action because of the misrepresentation.” Hunt Petroleum Corp. v. State, 901 So.2d 1, 5 (Ala.2004).
Moreover, a plaintiff must prove that he or she reasonably relied on the defendant’s misrepresentation in order to recover damages for fraud. AmerUs, 5 So.3d at 1207. Specialty Marketing alleged in its complaint that,
“[i]n or about November 2002 until early 2007, [Specialty Marketing] delivered its newly printed magazine to the defendants on a monthly basis for distribution by the defendants to truck stops and/or retail establishments across the United States. Each month, [Specialty Marketing] received an invoice from the defendants in the amount of $9,750.00. This amount represented the amount due to the defendants for delivery of all of [Specialty Marketing’s] magazines. In addition' to the invoices, [Specialty Marketing] periodically received copies of ‘route sheets’ from the defendants. These ‘route sheets’ were represented to [Specialty Marketing] to have been filled out by agents or employees of the defendants who were responsible for the actual distribution of the magazines. These ‘route sheets’ indicated that all of [Specialty Marketing’s] magazines were being distributed to the appropriate retail establishments. In addition to the ‘route sheets’ [Specialty Marketing] [was] periodically provided summaries of the distribution of [Specialty Marketing’s] magazines. These summaries also indicated delivery of all of [Specialty Marketing’s] magazines. In addition to the documents, between 2003 and December 2006, [Specialty Marketing] [was] assured by Defendants Wallace Adams, Gordon Adams, and Ed Leader that all of [Specialty Marketing’s] magazines were being distributed appropriately.”
Target Media and Leader contend that Specialty Marketing failed to offer substantial evidence that either of them represented that all the Truck Market News magazines had been or were being delivered or that the information contained in the spreadsheets was false. Specialty Marketing argues that it presented sufficient evidence to support its fraudulent-misrepresentation claim, including evidence indicating that Target Media and Leader represented to it that its magazines were moving well when, in fact, they were not and evidence indicating that many of the numbers on the spreadsheets had been fabricated to make the information “look good.” To the extent that Specialty Marketing argues that the inaccurate information and documentation Target Media provided were misrepresentations, I cannot agree. Without question, the 2002 distribution contract required Target Media to provide documentation on its delivery of Truck Market News, and it was reasonable for Specialty Marketing to expect that documentation to be accurate. Nevertheless, although Target Media’s failure to provide accurate documentation and other information can properly be considered a breach of contract, it does not necessarily follow that a party’s failure to perform under a contract is fraudulent.
I would focus in this case on Specialty Marketing’s contention that its reliance on Target Media’s and Leader’s representations was reasonable. In its brief to this Court, Specialty Marketing argues:
*873 “The representations to Terry Davis, as the owner of Specialty Marketing, were material. His reliance on them was reasonable, given the values involved, the importance of the activities to his company, Target Media’s status as a major distribution [sic], and its apparent expertise at the activities — of which Target Media and its employees assured him. Only an insider of the Defendant could have known that the representations and promises were false.”
Specialty Marketing’s brief, at 49. Other than its brief explanation of its contention that Davis’s reliance on Target Media’s representations was reasonable, however, Specialty Marketing did not discuss the reliance issue further.
During the trial, in response to questions asked by Specialty Marketing’s attorney regarding Davis’s receipt of the documentation discussed in the 2002 distribution contract, Davis testified:
“Q. Are [the exhibits Davis was examining] copies of the spreadsheets that you received from Target?
“A. Yes.
“Q. And do you recognize them as that?
“A. Yes, sir.
“Q. Do you remember receiving them?
“A. I remember receiving some.
“Q. Well, the ones that are in your hands?
“A. Yes, sir.
“Q. Do you know, Terry, these are the only ones we have copies of, and you provided these to me. Do you know if there were others that you received that we just don’t have copies of here today?
“A. No. This is all.
[[Image here]]
“Q. ... What information, Terry, did you try to get? Why did you look at them? What did you learn from these spreadsheets?
“A. I wanted to see how our [magazines] were moving. I wanted to see what was left in those racks.
“Q. So the ‘return’ column was important to you?
“A. It was the most important.
“Q. Whether it was mid month or any time?
“A. That’s right.
“Q. And did you rely, Terry, on these spreadsheets in determining how your [magazine] was doing as it was being distributed by Target?
“A. Oh, yeah.
“Q. Now, we said that you received those from '[0]3 till '04, some time in August of '04, I believe. Did you receive any after that time frame or after that day?
“A. No.
“Q. Did you ask for it?
“A. Yes.
“Q. Did you ask for something?
“A. Well, I kept asking, my sister and I both asked Gordon and then Wally [Adams], we’d ask for sheets and they just said they were behind.”
Despite the fact that Davis testified that he relied on the spreadsheets provided by Target Media, however, the record reflects that Specialty Marketing continued to work with Target Media for more than two years after Davis received the last spreadsheet. Although Davis testified that he asked Gordon Adams and Wallace Adams for the documentation required by the 2002 distribution contract, there is no evidence in the record indicating that Davis or Daniels ever made any inquiry as to the reason Target Media was not sending the information on which Davis testified they relied.
*874 Later during the trial, in response to questions asked by Specialty Marketing’s attorney regarding the company’s sales during the years the 2002 distribution contract was in place, Davis testified:
“Q. ... Terry, ... during the time that you were with Target [Media], did Truck Market News or did your business, in fact, grow? Did your sales increase from year to year?
“A. From the time I was with Target [Media]?
“Q. Yes.
“A. No.
“Q. In fact, during those years, your sales remained fairly flat, didn’t they?
“A. Um-hum.
[[Image here]]
“Q. ... Is that number on each of the tax returns, Terry, the number that you refer to as your sales for the year?
“A. Yes.-
“Q. And is that number the one that you were hoping, expecting to grow during your relationship with Target . [Media]?
“A. Yes.
“Q. What, from your perspective, and I don’t want you to tell me what anybody said to you, but what, from your perspective, Terry Davis, selling adds for Truck Market News during that four-year period or so to five, what changed? What was different, if anything, between before you and Target [Media] during the time frame that you were with Target [Media]?
“A. Well, we had to — the biggest problem we had was that, with the phone calls not coming in.
“Q. From your advertisers?
“A. From the advertisers.
“Q. What did you do when you weren’t just getting phone calls, what did you have to do to find people?
“A. We had to cut deals, we had to ... give them a half page for a full page — a full page for a half-page price or two pages price of one, things like that.
“Q. And am I correct at saying that the whole time you’ve been with Target [Media], you had to cut deals to some extent?
“A. Oh, yeah, we cut deals to — everybody cuts deals.
“Q. Did you find yourself having to work harder?
“A. Yes, to convince these people to run [advertisements].
“Q. Traditionally, Terry, ... was Truck Market News able to make enough money each' month to pay for the next month or did you borrow money as you went along?
“A. We had to start borrowing money.
“Q. Before you were with Target [Media], did you borrow money at all?
“A. No, no, not at all.”
The evidence in the record shows that, with the exception of one year, Specialty Marketing’s income was decreasing during the years it was associated with Target Media. Despite that fact, however, Davis did not testify that he or Daniels ever investigated the reasons for the decrease in income. In fact, Davis testified as follows on cross-examination:
“Q. Okay. Now, you mentioned when we first started this that you — like, [Target Media’s] failure to do the things that they were promising you that they were going to do had resulted in your business fall-off; true?
“A. Yes.
*875 “Q. Did you ever have any conversations with anyone at Target [Media] about that?
“A. Yeah, I had it with Gordon and Wally [Adams] both, but ... it never crossed my mind that the problem was with Target [Media]....
[[Image here]]
“A. I was told that [Truck Market News ] was moving great by Gordy and Wally [Adams], and even Ed [Leader] told me that the [magazine] was moving well.
“Q. You have to use your own common sense, don’t you, Mr. Davis?
“A. No, I have to use the sense of the people I’m paying the money to, that I have to trust somebody.
“Q. And so you don’t use your own common sense at all?
“A. What did you expect me to do, call them liars?
“Q. No, sir. I’m just asking you, in any business transaction, should you also be required to use your own common sense?
“A. I did what I thought was right and I thought they were doing their job.... I would never have thought that Target Media had anything to do with this.”
In light of the foregoing testimony, it cannot be said that Specialty Marketing reasonably relied on Target Media’s representations. As this Court stated in Torres v. State Farm Fire & Casualty Co., 438 So.2d 757, 759 (Ala.1983): “[T]he right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests.” Here, Specialty Marketing took no precautions to safeguard its interests. If nothing else, Target Media’s failure to provide the spreadsheets after August 2004 and Specialty Marketing’s continued decline in business and income should have provoked inquiry or an investigation of the facts by Davis and Daniels. There is no evidence indicating that Davis or Daniels ever made any effort beyond occasional telephone inquiries to investigate Target Media’s distribution facility or its procedures during the entire four years they worked with Target Media. Based upon the record before us, I would conclude that Specialty Marketing took no precautions to safeguard its own interests but, instead, blindly trusted Target Media’s representations.
Specialty Marketing and Target Media, both corporations, negotiated the 2002 distribution contract on equal footing. From my review of the record, it is clear that they should be viewed as equals in fact and in the eyes of the law. The negotiations between the corporations culminated in Davis’s and Gordon Adams’s executing the contract on behalf of Specialty Marketing and Target Media d/b/a Target Distribution Partners, respectively. The contract is clear and unambiguous. It sets out Target Media’s promise to deliver Truck Market News monthly to 275 locations, its guarantee to prominently display Truck Market News, and its promise to provide documentation of the delivery and display to Specialty Marketing. Because the jury could have concluded that Target Media threw away large portions of Truck Market News each month without attempting to deliver most of the magazines, much less prominently display them, and, in addition, stopped providing documentation to Specialty Marketing after approximately two years, this Court holds in the main opinion, a holding with which I concur, that the jury properly considered whether Target Media breached the contract. However, I am unable to find any evidence to suggest that Specialty Marketing’s reliance on Target Media’s representations was reasonable as a matter of law. Conse *876 quently, I must conclude that, as a matter of law, Specialty Marketing’s fraudulent-misrepresentation claim should not have been submitted to the jury. I respectfully dissent as to the main opinion’s affirmance of the trial court’s order denying Target Media and Leader’s motion for a JML as to the fraudulent-misrepresentation claim.
B. Promissory Fraud
I now turn to Specialty Marketing’s promissory-fraud claim. “A claim of promissory fraud is ‘one based upon a promise to act or not to act in the future.’ ” Ex parte Michelin North America, Inc., 795 So.2d 674, 678 (Ala.2001) (quoting Padgett v. Hughes, 535 So.2d 140, 142 (Ala.1988)). “The law places a heavier burden upon the plaintiff in promissory-fraud cases than in ordinary fraud cases.” Heisz v. Galt Indus., Inc., 93 So.3d 918, 928 (Ala.2012).
“ ‘The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.’ ”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1160 (Ala.2003) (quoting Padgett v. Hughes, 535 So.2d at 142).
In response to questions from Specialty Marketing’s attorney during his direct examination, Gordon Adams testified as follows about his negotiations with Davis resulting in the execution of the 2002 distribution contract.
“Q. Now, was it your intention, as the general manager of Target Distribution Partners in November 2002, assuming Specialty Marketing accepted your terms, to live up to this contract?
“A. It was my intentions, yes, sir.
“Q. And you were acting on behalf of the corporation?
“A. Corporation? Target Distribution.
“Q. Target Distribution Partners?
“A. Yes, sir.
[[Image here]]
“Q. Then there was also a promise there would be documentation that includes proof of delivery. When you wrote this contract and signed it and you signed it and then sent it to Terry for him to sign it; correct?
“A. Yes, sir.
“Q. When you wrote it and signed it, were you serious on behalf of Target Distribution Partners that the customer, if he accepted this contract, was going to be given documentation to prove delivery?
“A. Yes.
[[Image here]]
“Q. ... Would it be fair to say that you, as the general manager, negotiating in this agreement for Target Distribution Partners, intended for the customer to believe that you would perform what you were doing and not mislead them?
“A. True.
“Q. You wanted the customer to rely on you, didn’t you?
“A. Yes, sir.”
Furthermore, Leader, who was Gordon Adams’s supervisor and who provided input concerning the contract negotiations, *877 testified as follows in response to questions from Specialty Marketing’s attorney about the 2002 distribution contract:
“Q. Now, the next item is delivery twice a month; correct?
“A. On the contract, sir?
“Q. Yes.
“A. Yes, I believe so —
[[Image here]]
“Q. ... Now, the next item is guaranteed prominent display of each location; correct?
“A. That is correct.
“Q. What does the word ‘guaranteed’ mean to you?
“A. That it’s guaranteed.
“Q. That means no exceptions, doesn’t it?
“A. Yeah.
[[Image here]]
“Q. So your company was serious about making that promise?
“A. Yes.”
Specialty Marketing had the burden of proving that, when Gordon Adams and Leader negotiated the 2002 distribution contract on behalf of Target Media, they intended not to perform under the contract as promised and they intended to deceive Specialty Marketing. Their testimony at trial, however, clearly shows that Specialty Marketing did not meet its burden. Even though the evidence at trial showed that Target Media did not, in fact, perform as promised, this Court has said that a defendant’s failure to perform is not enough to show a present intent not to perform. Heisz, 93 So.3d at 925. Consequently, I conclude that, as a matter of law, Specialty Marketing’s promissory-fraud claim should not have been submitted to the jury. I respectfully dissent as to the main opinion’s affirmance of the trial court’s order denying Target Media’s motion for a JML as to the promissory-fraud claim.
STUART and BOLIN, JJ., concur.

On Return to Remand

PER CURIAM.
The defendants, Target Media Partners Operating Company, LLC (“Target Media”), and Ed Leader, appealed from a judgment entered in favor of the plaintiff, Specialty Marketing Corporation d/b/a Truck Market News (“Specialty Marketing”). Specialty Marketing had sued Target Media and Leader, alleging breach-of-contract claims against Target Media and fraudulent-misrepresentation and promissory-fraud claims against Target Media and Leader. Target Media had filed a counterclaim alleging breach-of-contract claims against Specialty Marketing. A jury returned verdicts in favor of Specialty Marketing on its breach-of-contract claim, awarding compensatory damages of $851,552; in favor of Target Media on its breach-of-contract counterclaim, awarding compensatory damages of $48,800; in favor of Specialty Marketing and against Target Media on Specialty Marketing’s promissory-fraud claim, awarding compensatory damages of $210,000 and punitive damages of $630,000; in favor of Leader on Specialty Marketing’s promissory-fraud claim; and in favor of Specialty Marketing and against Target Media and Leader on Specialty Marketing’s fraudulent-misrepresentation claim, awarding compensatory damages of $167,800 and punitive damages of $503,400. The trial court entered a judgment on that verdict. This Court affirmed the judgment as to the compensatory-damages awards but remanded the cause with instructions for the trial court to hold a hearing on the question whether the punitive-damages awards are excessive. See Target Media Partners Operating Co. v. Specialty Marketing Corp., 177 *878 So.3d 843 (Ala.2013) (Parker and Wise, JJ., concurred; Moore, C.J., and Shaw and Bryan, JJ., concurred in the result; Mur-dock, J., concurred in the rationale in part and concurred in the result; and Stuart, Bolin, and Main, JJ., concurred in part and dissented in part). Pursuant to our instructions, the trial court, on January 17, 2014, held a hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), at the conclusion of which the trial court reaffirmed the punitive-damages awards. The trial court made its return to this Court on March 24, 2014. The only issue now before this Court is whether the punitive-damages awards áre, as Target Media and Leader contend, excessive.
The trial court entered the following thorough and well reasoned order on remand:
“This matter comes before the court on remand from the Supreme Court of Alabama. Pursuant to the Court’s opinion of September 6, 2013, a Hammond/Green Oil hearing was held on January 17, 2014, to review the punitive damages awarded by the jury in this cause and to consider the arguments made by defendant Target Media Partners Operating Company, LLC (hereinafter ‘Target [Media]’), and defendant Ed Leader in their motions for' remittitur. The punitive damages were returned by the jury on [Specialty Marketing]’s claims of fraudulent misrepresentation as to Target [Media] and Leader and on [Specialty Marketing's promissory-fraud claim as to defendant Target [Media], Specifically, the jury returned a verdict against defendant Target [Media] on the claim for promissory fraud in the amount of $210,000 in compensatory damages and $630,000 in punitive damages. The jury returned a verdict against defendant Target [Media] and defendant Leader on the claim for fraudulent] misrepresentation in the amount of $167,800 in compensatory damages and $503,400 in punitive damages.
“This was a well-tried case on behalf of all parties. The court has carefully considered the briefs and arguments submitted by the parties as well as the evidence presented at the Hammond/Green Oil hearing held on January 17, 2014. This court has thoughtfully considered the testimony of each and every witness who testified during this almost two-week trial as well as the attentive jury who decided the case. With regard to [Target Media’s and Leader’s] motions for remittitur, the court has analyzed the Hammond/Green Oil factors, which the court is duty-bound to consider. The court, after careful consideration of all the Hammond/Green Oil factors, finds that there is no legal basis justifying remittitur of the-punitive damages verdict returned by the jury in this case. The court finds that there was substantial evidence justifying and supporting the verdict as to all of the named defendants. There is no compelling justification for this court to remit the award in this case. The jury’s award in this case is consistent with, and in line with, judgments that have been affirmed by the Alabama Supreme Court in recent years.
“In assessing the appropriateness of the amount of a punitive damages verdict and judgment, the Alabama Supreme Court and the United States Supreme Court have provided certain guidelines or factors for a trial court to consider. In BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), most of these guidelines are *879 set forth. The factors to be considered under Green Oil and the associated case of Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), as stated in Green Oil, are as follows:
“ ‘(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant’s conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small; if grievous, the damages should be much greater.
“ ‘(2) The degree of reprehensibility of the defendant’s conduct should be considered. The duration of this conduct, the degree of the defendant’s awareness of any hazard which his conduct has caused or is likely' to cause, and any concealment or “coverup” of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
“ ‘(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
‘“(4) The financial position of the defendant would be relevant.
“‘(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
“ ‘(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
“ ‘(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.’ “Green Oil, 539 So.2d at 223-24.
“The three BMW ‘guideposts’ are here numbered as factors (8), (9), and (10):
“(8) Reprehensibility. The U.S. Supreme Court majority stated that the most important factor in the analysis is ‘the degree of reprehensibility of the defendant’s conduct.’ BMW, [517 U.S. at 575],
“(9) Ratio. The second ‘guidepost’ is the relationship between compensatory and punitive damages. Id. at [580].
“(10) Legislative Penalties. The third ‘guidepost’ is a comparison to comparable legislative fines and penalties for comparable misconduct. Id. at [583-84].
“At the hearing on January 17, 2014, [Target Media and Leader] presented evidence almost exclusively in regard to their respective financial positions. However, in their brief, [Target Media and Leader] argued other factors which they felt were relevant. The court has given de novo review to each of the factors, and herein states the court’s conclusions:
“1. Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendants’ conduct as well as to the harm that actually has occurred. The evidence presented at trial made clear that [Specialty Marketing] was significantly injured as a result of [Target Media and Leader’s] conduct. As stated by the Supreme Court in its opinion, ‘the jury heard ample evidence from which it could have found harm’ to [Specialty Marketing] as a result of [Target Media and Leader’s] conduct. Target Media Partners Operating Co. v. Specialty Marketing Corp., 177 So.3d 843, 859 (Ala.2013). The Court went on to say that the evidence before the jurors in *880 this case was sufficient to find that [Specialty Marketing] ‘lost business and profits.’ Id. [at 861]. In addition to the $400,000 paid to Target [Media], the evidence indicated that [Specialty Marketing]’s expenses were in excess of $1,500,000 in printing and shipping costs, much of which was lost due to [Target Media and Leader’s] fraudulent conduct. This factor weighs in favor of [Specialty Marketing].
“2. The degree of reprehensibility of the defendants’ conduct should be considered. The relation of this conduct, the degree of the defendants’ awareness of any such conduct and any concealment or cover-up, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility. The degree of reprehensibility here is extremely high in that the evidence established that [Target Media and Leader] entered into their relationship with [Specialty Marketing] and continued that relationship for over four (4) years — all the while knowing they never intended to perform the services which had been promised.
“The most important factor the Court should consider in determining whether a remittitur is warranted is the relative degree of the defendants’ culpability. ‘Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendants’ conduct.’ BMW v. Gore, 517 U.S. at 575. Given the facts presented in this case, it is clear that the evidence supported a finding by the jury that [Target Media and Leader’s] conduct was highly reprehensible.
“In its opinion, the Supreme Court found:
“ ‘It cannot be disputed in this case that the jurors reasonably could have found that Target Media and its principals made fraudulent misrepresentations, that those misrepresentations involved material facts, and that those misrepresentations damaged Speciality Marketing.’
“Target Media, [177 So.3d at 864].
“Mobile Infirmary Association v. Tyler, 981 So.2d 1077 (Ala.2007), makes it clear that reprehensibility is not a mathematical formula based on a number of wrongful acts. However, the number of wrongful acts can aggravate the reprehensibility factor. The evidence here is that [Target Media] engaged in this same conduct prior to entering into the relationship with [Specialty Marketing] as well as at the time it was negotiating to distribute [Specialty Marketing]’s magazines.
“The evidence shows that [Target Media] never intended to fulfill the promises that it made to [Specialty Marketing]. The evidence here established that in addition to the $400,000 paid directly to [Target Media], [Specialty Marketing] paid approximately $900,000 in printing costs, approximately $200,000 of which the jury could have found was attributed solely to magazines that were thrown away in Oxford, Alabama, and that [Specialty Marketing] lost business and profits as a result of [Target Media and Leader’s] conduct. This court agrees with the statement made by [Specialty Marketing] in its brief that ‘in the context of the relationship between [Specialty Marketing] and [Target Media] in this case, there can be no more reprehensible conduct than to lie and defraud the other party and to utterly fail — intentionally—to perform the duties promised.’ The evidence here was clear and convincing that [Target Media and Leader’s] conduct was consistent and continuous throughout the rela *881 tionship between the parties. This factor weighs heavily in favor of [Specialty Marketing].
“3. If the wrongful conduct is profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit so that the defendant recognizes a loss. Ex parte Vulcan Materials Co., 992 So.2d 1252 (Ala.2008). In this case, the total amount of punitive damages given by the jury was $1,133,400. The evidence was that [Specialty Marketing] paid [Target Media] $400,000 for services that were not performed. [Target Media and Leader] committed themselves to defrauding [Specialty Marketing] and coerced employees to ensure that the fraud was accomplished. The evidence clearly established that [Target Media and Leader] did so to create a profit by placing Target [Medians own books ahead of [Specialty Marketing]’s, by destroying [Specialty Marketing^ books, and by pocketing $400,000 in contract proceeds without working for that money. Moreover, as noted by the Supreme Court, [Target Media and Leader] did this never intending to fulfill the promises made to [Specialty Marketing].
“This Court believes that the jury provided punitive damages in excess of the profits gained by [Target Media and Leader] so that [Target Media and Leader have] recognized a loss which is reasonable in the context of [their] conduct.
“[Target Media and Leader argue] that there is no evidence that defendant Leader profited from the conduct underlying the punitive damages in this case. Evidence at the hearing established that Leader earned between $100,000 and $150,000 each of the years of the contractual relationship between Target [Media] and [Specialty Marketing]. This would total between $400,000 and $600,000 during the time frame that [Specialty Marketing] was actively being defrauded. The Court finds that profit gained by Target [Media] should be imputed, at least in part, to defendant Leader, an officer of the company. This is true not only with regard to moneys paid by [Specialty Marketing] directly to [Target Media], but also by distributing and displaying [Target Medians books in place of [Specialty Marketing]’s books. This is especially true since Leader was established to be one of the point men in accomplishing the fraud. This factor weighs against remittitur.
“4. The financial position of the defendant would be relevant. This is the factor argued most vehemently by [Target Media and Leader]. The evidence presented at the Hammond/Green Oil hearing was almost exclusively with regard to this factor. [Target Media] presented financial statements/audits showing that Target Media lost tens of millions of dollars between the years 2008 and 2012, and that Target Media currently has a negative net worth of millions of dollars. Similarly, [Target Media and Leader] offered evidence at the hearing that Ed Leader has made between $100,000 and $150,000 per year in his employment with Target [Media] since 2001; that Leader is ‘underwater’ in his home and has a ‘modest retirement plan.’ The evidence at the hearing was that his retirement plan has a few hundred thousand dollars in it.
“[Target Media and Leader] argued that the imposition of $1,133,400 against Target [Media] ‘may very well destroy it.’ [Target Media and Leader] further argued that the imposition of any punitive damages against Leader will have the effect of destroying him.
“The Alabama Supreme Court has stated that ‘punitive damages should *882 sting, but should not destroy a defendant.’ Green Oil [589 So.2d] at 222. The court has performed its own de novo examination of the amount of the verdict, and the court can find no valid basis for any remittitur. A review of [Target Media’s] financial statements reveals that the financial health of Target Media is not likely to depend or be largely affected by the relatively small punitive damages award from this case. The company continues to generate several million dollars in revenue each year. In fact, the only witness who testified on behalf of Target Media at the Hammond/Green Oil hearing was the individual defendant and officer of the corporation, Ed Leader. When asked directly whether this punitive damages award would cripple or destroy Target Media, Leader testified that he had no information that that would be true, and further testified that he doubted the size of this verdict would have much of an effect in the context of the company’s current financial condition. From the evidence before this court, it is evident that the jury award, while inflicting a sting on Target Media, is not significant in terms of that company’s size and operations.
“[Target Media and Leader’s] argument with regard to Leader is effectively that the punitive damages award against him should be reduced to ‘zero.’ This position shocks the conscience of the court. All of the evidence regarding the deceptive and fraudulent conduct of [Target Media] as it relates to the fraud/misrepresentation claim is also applicable to Ed Leader. While the evidence showed that the conduct was carried out by many of [Target Media’s] employees, that conduct was ordered and overseen by Ed Leader. The court finds that a remittitur (especially to zero) would fail to do justice and would fail to serve the law’s twin aims of specific and general deterrence. Contrary to [Target Media and Leader’s] argument, a judgment lien, no matter how large, is not a financial death penalty. Present Alabama law limits the percentage of wage garnishment and limits the effective range of a judgment to a maximum of 20 years.
“With regard to both Target Media and Leader, the court notes that collecti-bility of this judgment is not the sole issue in a punitive damages case. The fact that this judgment may be difficult to collect is not the sole interest or relevant factor. An equally central purpose of punitive damages is general deterrence — the amount of the verdict is intended as a warning to all potential corporate and individual defendants not to engage in intentional, fraudulent behavior. A remittitur in this case would mitigate the efficacy of this verdict’s value to general deterrence. A remittitur would also disrespect this jury’s work. This factor weighs against remittitur.
“5. All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial. This factor has not been argued by the parties herein, so the court finds that this is a neutral factor in this case.
“6. If criminal sanctions had been imposed on [Target Media or Leader] for [their] conduct, this should be taken into account in litigation of the punitive damages award. This factor is not applicable.
“7. If there had been other civil actions against the same defendants, based on the same conduct, this should be taken into account in litigation of the punitive damages award. There is no evidence before this court of any actions based on the same conduct.... This factor weighs in favor of [Specialty Marketing].
*883 “8. Reprehensibility. This United States Supreme Court BMW ‘guidepost’ is already discussed in No. 2 above.
“9. Ratio. The second BMW ‘guidepost’ is the relationship between compensatory and punitive damages. In this case, the jury returned a verdict for compensatory damages in the amount of $377,800 in the fraud and promissory-fraud claims. The punitive damages given were in the amount of $1,133,400. The ratio of punitive to compensatory damages here is 3:1.
“The Alabama Supreme Court has approved a 3:1 ratio ‘benchmark.’ The 3:1 ‘benchmark’ approved by the Alabama Supreme Court has been held to be ‘presumptively reasonable.’ Prudential Ballard Realty Co. v. Weatherly, 792 So.2d 1045 (Ala.2000). The Supreme Court has further held that a ratio of 3:1 weighs against a remittitur, without some special justification. ‘Only in the most extraordinary situations would the award be deemed excessive when the [punitive damages award] is at or below the benchmark.’ Weatherly [792 So.2d] at 1053; see also Southern Pine Electric Cooperative v. Burch, 878 So.2d 1120 (Ala.2003). The Court finds that this case does not present a ‘most extraordinary’ situation that would dictate reducing the punitive damages in this case. This factor weighs heavily in favor of [Specialty Marketing],
“10. Legislative penalties. The third BMW ‘guidepost’ is a comparison to comparable legislative fines and penalties for comparable misconduct. Here, the jurors awarded punitive damages that do not exceed three times the amount of the compensatory damages awarded. These punitive damages are no more than the monetary penalties [Target Media and Leader] could suffer under the Alabama Deceptive Trade Practices Act, Ala.Code 1975 § 8-19-1 et seq. That act prescribes (1) fines, (2) treble compensatory damages, and (3) an award of costs and attorney fees. The comparable legislative penalty is virtually equivalent to the jury’s verdict in this case. This factor weighs in [Specialty Marketingj’s favor and against re-mittitur.
“Therefore, for all these reasons, the request for remittitur by defendant Target Media Partners Operating Company, LLC, and defendant Ed Leader is denied. The court finds that the jury’s punitive damages verdict against Target Media Partners Operating Company, LLC, in the amount of $630,000 on [Specialty Marketing]’s claim of promissory fraud and the jury’s verdict for punitive damages against defendant Target Media Partners Operating Company, LLC, and defendant Ed Leader on [Specialty Marketing]’s claim of fraud[ulent misrepresentation] in the amount of $503,400 [were] fair, reasonable and justified.”
We need add nothing to the trial court’s detailed analysis of the BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and Hammond/Green Oil factors in this case. After reviewing that analysis, we agree that, based on the level of reprehensibility of the misconduct evidenced in this case, a $630,000 punitive-damages award against Target Media on the promissory-fraud claim and a $503,400 punitive-damages award against Target Media and Leader on the fraudulent-misrepresentation claim are sufficient to punish Target Media and Leader and to deter them from further misconduct, without compromising their due-process rights. The judgment entered on the punitive-damages awards of $630,000 and $503,400 is hereby affirmed.
AFFIRMED.
*884 MOORE, C.J., and PARKER, MURDOCK, SHAW, WISE, and BRYAN, JJ., concur.
STUART, BOLIN, and MAIN, JJ., dissent.