**Rel: 12/5/14**

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

OCTOBER TERM, 2014-2015

————————————

1130604

————————————

**Corner Stone Funeral Chapel, Inc.**

v.

**MVMG, LLC**

**Appeal from DeKalb Circuit Court**
**(CV-09-900101)**

BRYAN, Justice.

Corner Stone Funeral Chapel, Inc. ("Corner Stone"), appeals from a judgment ordering a receiver to transfer the assets of a cemetery business to MVMG, LLC, a competitor of Corner Stone's. We affirm.

Mountain View Memory Gardens & Mausoleum, Inc. ("the corporation"), owned a cemetery in Rainsville known as Mountain View Memory Gardens and Mausoleum ("the cemetery"). The corporation sold "preneed contracts" to people planning to be interred at the cemetery or planning to have loved ones interred there. A purchaser of a preneed contract pays for funeral merchandise, funeral services, cemetery merchandise, or cemetery services that will be provided upon a person's death. § 27-17A-2(57), Ala. Code 1975. Preneed contracts in Alabama are regulated by the Preneed Funeral and Cemetery Act, § 27-17A-1 et seq., Ala. Code 1975 ("the Preneed Act"), which was enacted in 2002.

Jeanette Mince was the sole owner and officer of the corporation, and she apparently ran the corporation and the cemetery. Mince died in 2008, leaving the corporation to her two daughters. However, her daughters were not interested in operating the corporation, and they expressed an intention to disclaim any interest in it. After Mince's death, the corporation failed to renew its certificate permitting it to sell preneed contracts under the Preneed Act. In 2009, the Alabama Department of Insurance ("the Department")

investigated the corporation's records and discovered that the corporation was in poor shape. The Department found that the corporation had underfunded certain trust funds required to be established by the Preneed Act, that the corporation was insolvent, that the corporation had ceased doing business, and that the cemetery had effectively been abandoned. The Department found that the continued control of the cemetery by the corporation would be hazardous to preneed-contract purchasers and beneficiaries in particular and to the people of Alabama in general.

Based on the Department's findings, Jim Ridling, in his official capacity as the commissioner of the Department, filed a complaint against the corporation, seeking preliminary and permanent injunctions. Relying on provisions in the Preneed Act, Ridling asked the trial court to enjoin the corporation from conducting business or disposing of its assets. At the time of the trial, those assets consisted of the cemetery, a mausoleum at the cemetery, some property next to the cemetery, a building and storage structure at the cemetery, and less than $26,000 in cash. Ridling also asked the trial court to appoint a receiver to take control of the corporation and

eventually to liquidate and dissolve the corporation, subject to the trial court's supervision.[1]

In June 2009, the trial court entered a preliminary injunction, essentially enjoining the corporation from operating; the order also appointed Denise Azar, an employee with the Department, as receiver for the corporation. The trial court directed Azar to take possession of the corporation's assets and to attempt to liquidate those assets, subject to the trial court's approval. The trial court also authorized Azar to enter into agreements for the management and maintenance of the cemetery until the cemetery could be sold or otherwise liquidated. Shortly after she was appointed receiver, Azar arranged for Rainsville Funeral Home, Inc., a local funeral business, to mow, trim, and clean the cemetery; to locate grave spaces; to open and close graves for burials at the cemetery; and to place markers and monuments during the

---

[1]Ridling acted under § 27-17A-17(b), Ala. Code 1975, a part of the Preneed Act. That section provides:

> "The commissioner may apply for an order directing the commissioner to liquidate a [preneed] certificate holder ... when, in the commissioner's opinion, the continued operation of the certificate holder would be hazardous either to purchasers, beneficiaries, or to the people of this state."

receivership period. Rainsville Funeral Home has performed those services since sometime in 2009.

During the receivership period, the mausoleum located at the cemetery continued to fall into disrepair. The roof was rotten and leaking, and parts of the mausoleum's interior had been badly damaged by leaking water, including the ceiling, flooring, and furniture. Vandals had broken into the mausoleum and further damaged it. Elsewhere in the cemetery, graves had been driven over and there was some other evidence indicating that the cemetery was in a generally run-down condition. In response, individuals owning plots and vaults in the cemetery formed the MVMG Mausoleum Association ("the Association") during the receivership period to preserve the cemetery. The Association collected donations from the community and, with Azar's permission, made substantial repairs to the mausoleum. The Association eventually intervened in the underlying case.

Azar unsuccessfully attempted to find a buyer for the cemetery, and she eventually concluded that the cemetery was unmarketable. Azar recommended that the cemetery and the corporation's other assets be transferred to an entity that would both operate the cemetery and honor, either in whole or

in part, the corporation's approximately 1,155 outstanding preneed contracts. The extent of outstanding services and merchandise purchased in those preneed contracts is unknown; typically a preneed contract covers only a portion of the services and merchandise available. Two entities presented proposals to Azar seeking the transfer of the assets, of which the cemetery is the main asset: Corner Stone and MVMG, LLC ("the LLC"); both of those entities were allowed to intervene below.

The LLC was formed in 2011 by Keary Chandler, the owner of Rainsville Funeral Home, which, as noted, provided maintenance and services at the cemetery during the receivership period. At times, the trial court treated the LLC as synonymous with Rainsville Funeral Home and Chandler, which appears to be a useful observation for purposes of this Court's review. The differences between the two proposals was fleshed out at trial and will be discussed in more detail below. One primary difference is that Corner Stone, unlike the LLC, agreed to provide, at no extra cost, markers and monuments that had already been purchased in outstanding preneed contracts. Azar recommended that the trial court

6

accept Corner Stone's proposal. Following an ore tenus trial on the issue held in 2013, the trial court disagreed with Azar and decided to accept the LLC's proposal. Thus, the trial court entered a permanent injunction that, among other things, ordered Azar to transfer the corporation's assets to the LLC.

The trial court's order did not completely dispose of the case; the order noted that the trial court would schedule a final hearing to resolve issues concerning any claims of creditors against the corporation and any other pending issues. Corner Stone subsequently moved the trial court to certify its order transferring the assets to the LLC as a final judgment under Rule 54(b), Ala. R. Civ. P. The trial court certified the order as final under Rule 54(b), and Corner Stone appealed.[2]

The parties disagree as to the proper standard of review. The trial court received ore tenus evidence at trial. The LLC

---

[2]Corner Stone filed an appellant's brief and reply brief, and the LLC filed an appellee's brief. Ridling filed a brief ostensibly as an appellee, but that brief urges this Court to reverse the trial court's judgment. In substance, Ridling's brief is an appellant's brief, but Ridling never filed a notice of appeal, and Corner Stone's notice of appeal lists only Corner Stone as an appellant. Thus, in fact there appears to be only one appellant (Corner Stone) and one appellee (the LLC).

1130604

argues that the ore tenus standard of review applies; conversely, Corner Stone argues that the evidence before the trial court was undisputed and that therefore our review is de novo.

The ore tenus standard applies. Corner Stone's assertion that the evidence is undisputed is contradicted by the record. As noted, one difference between the two proposals is that Corner Stone, unlike the LLC, agreed to provide, at no extra cost, markers and monuments (collectively "markers") that had already been purchased in outstanding preneed contracts. William Dalton, Corner Stone's owner, estimated at trial that assuming liability for the markers would cost Corner Stone about $60,000. However, Chandler, the owner of the LLC and of Rainsville Funeral Home, estimated that providing the markers would cost Corner Stone "more like $150,000." Chandler also questioned the economic feasibility of Corner Stone's proposal; when asked about the LLC's proposal, Chandler indicated that to "do otherwise," i.e., to provide the markers as Corner Stone proposed, would be unwise and economically unfeasible. However, Dalton obviously did not think that Corner Stone's proposal was unfeasible. It is unclear how

8

many markers had already been paid for in the outstanding preneed contracts. Both Dalton and Chandler could only estimate the total cost of the markers -- however many there are -- and they disagreed on the economic feasibility of providing the markers at no cost to the preneed-contract holders. Of course, evidence pertaining to the markers is relevant in evaluating the two proposals. The evidence regarding the markers was disputed, thus defeating Corner Stone's argument that the ore tenus standard does not apply because, it says, the evidence is undisputed.

"[A] judgment based on findings of fact based on [ore tenus] testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error." Allstate Ins. Co. v. Skelton, 675 So. 2d 377, 379 (Ala. 1996). Further, "[w]here the evidence is presented to the trial court ore tenus, ... the trial court determines the weight and credibility of the testimony." Wheeler v. Marvin's, Inc., 593 So. 2d 61, 63 (Ala. 1991).

Further, in attempting to convince this Court to review the judgment de novo, Corner Stone ignores the fact that the trial court's decision involved a matter within its

9

discretion.[3]  At its heart, this appeal concerns the trial court's handling of a receivership, which is an equitable remedy.  "A receiver is an impartial officer of the court" who is "appointed to collect and preserve property and at the direction of the court to dispose of it and its proceeds." Ally Windsor Howell, Tilley's Alabama Equity § 31:1(a) (5th ed. 2012). Generally, "[t]he court has the discretion in receivership proceedings to do what is best for all concerned."  65 Am. Jur. 2d Receivers § 135 (2011).  This Court has stated that a trial court may order the sale of properties possessed by its receiver "when, in the exercise of judicial discretion, such sale is deemed to the best interest of those concerned."  Darley v. Alabama Pub. Utils. Co., 236 Ala. 463, 465, 183 So. 447, 448 (1938).  Although this case concerns the transfer of assets instead of a sale (the cemetery was determined to be unmarketable), the same general principle regarding receiverships applies: the trial court has the discretion to do what is in the best interest of those

---

[3]In its initial brief, Corner Stone mentions in the "facts" section that it argued to the trial court that the court had exceeded its discretion in transferring the assets to the LLC.  That appears to be the only reference in Corner Stone's briefs to the trial court's exercise of its discretion.

concerned. See also Seiple v. Mitchell, 239 Ala. 533, 535, 195 So. 865, 865 (1940) (stating, regarding the compensation given to the receiver by the court, that that was a matter "primarily within the sound discretion of the court having the custody and control of the receivership, having regard to all the relevant circumstances"). Here, those concerned with the fate of the cemetery include not only the preneed-contract holders, but also the general public, especially the local community. Note that § 27-17A-17(b), Ala. Code 1975, allows the commissioner of the Department to seek liquidation of a cemetery business when its continued operation would be hazardous either to preneed-contract "purchasers [or] beneficiaries, or to the people of this state."

In this case, the trial court was free to manage the receivership within its discretion. Our review of the trial court's judgment is limited to determining whether the trial court exceeded that discretion.

> "'A court exceeds its discretion when its ruling is based on an erroneous conclusion of law or when it has acted arbitrarily without employing conscientious judgment, has exceeded the bounds of reason in view of all circumstances, or has so far ignored recognized principles of law or practice as to cause substantial injustice.'"

1130604

Wright Therapy Equip., LLC v. Blue Cross & Blue Shield of Alabama, 991 So. 2d 701, 705 (Ala. 2008) (quoting Edwards v. Allied Home Mortg. Capital Corp., 962 So. 2d 194, 213 (Ala. 2007)). The discretion afforded the trial court is only strengthened by the ore tenus presumption in this case. Given our deferential review, this is a straightforward appeal in which the judgment is due to be affirmed.

Certainly there is evidence supporting both Corner Stone's and the LLC's proposal. For instance, on the Corner Stone side, Azar (the receiver) concluded that Corner Stone had the better proposal, and she recommended that the trial court accept it over the LLC's proposal. Azar based her opinion on the fact that Corner Stone, unlike the LLC, agreed to provide any markers that had already been purchased in outstanding preneed contracts at no additional cost to the preneed-contract holders. Azar concluded that this fact made Corner Stone's proposal a better deal for the preneed-contract holders, and that settled the issue for her. At trial Azar testified that, besides the marker issue, there were no other differences between the proposals. However, the evidence

indicates otherwise, and that fact may have undermined the strength of Azar's opinion in the view of the trial court.

Chandler highlighted other differences between the proposals, one of which involves the endowment-care trust fund and the use of remaining funds held by the corporation -- less than $26,000. The Preneed Act requires each cemetery business to maintain an endowment-care trust fund to provide for the endowment care of the cemetery it operates, i.e., the maintenance and any repairs. § 27-17A-47 and § 27-17A-2(27), Ala. Code 1975. Regarding the endowment-care trust fund, the Preneed Act, at the relevant time, provided that "[t]he amount of each bond shall be a minimum of ... $25,000." § 27-17A-47 (as it read before a 2014 amendment). Chandler testified that, if the LLC were awarded the assets of the corporation, the LLC would place $25,000 of the remaining funds immediately into the endowment-care trust fund. Conversely, Dalton testified that, if Corner Stone were awarded the assets, Corner Stone would place $8,971.52 of the remaining funds into the endowment-care trust fund and then deposit a minimum of $5,000 per year until the balance reached $25,000.

Chandler's plan to fully fund the endowment-care trust fund immediately was cited as a factor weighing in the LLC's favor by Janice Gilbert, one of the Association members who testified at trial. Gilbert holds a preneed contract, and her late husband is buried in the cemetery. Gilbert testified that she wants Chandler and the LLC to take control of the cemetery. She testified that Chandler had taken care of her husband's funeral; that she trusted Chandler's family (Rainsville Funeral Home is family-run); and that Rainsville Funeral Home is more conveniently located than Corner Stone's funeral home, which is located in Ider.

Gilbert and others discussed the need for financial stability in the future operation of the cemetery. Gilbert noted that Mince, the corporation's previous owner, had experienced financial difficulties and had had trouble providing markers that had already been purchased in preneed contracts. Regarding her own experiences, Gilbert testified that she could not get the marker for her late husband's grave site that they had purchased in a preneed contract and that she eventually had to buy a cheaper one instead. Based on Mince's track record, Gilbert was doubtful that Corner Stone

would be able to absorb the cost of providing the markers purchased in the outstanding preneed contracts. As noted, Chandler opined that Corner Stone's plan to provide the markers at no cost to the preneed-contract holders was not economically feasible. The trial court was free to find Chandler's testimony more credible than Dalton's on this issue. Deborah Thomas, the president of the Association, testified about the substantial repairs the Association made to the mausoleum after the corporation became insolvent and the mausoleum was allowed to fall into disrepair. She said that, before the Association made the repairs, the condition of the mausoleum had become an embarrassment to the community. See, e.g., Editorial, "Fixing a Disgrace," Times-Journal (Ft. Payne), June 5, 2013 (describing the situation at the cemetery as a "disgrace" and an "embarrassing problem"). Both she and Hubert Tumlin, the treasurer of the Association, testified that they did not want to go through such an ordeal again. Concern in the community about future financial stability for the cemetery was a key issue expressed at trial; the trial court, in evaluating this concern, was free to place more

weight on evidence, such as Chandler's testimony, questioning the economic feasibility of Corner Stone's proposal.

Other evidence supports the trial court's decision as well. At the time of the trial, Chandler had approximately 17 years' experience operating the cemetery in Rainsville and approximately 34 years' experience in the funeral-home business. Dalton, although quite experienced, seems to have less experience. At trial, he testified that Corner Stone acquired its first cemetery about 4 or 5 years ago and had since acquired 2 more cemeteries; he also stated that he had served as a trustee and taken care of a couple of private cemeteries for the last 10 to 12 years. Although Dalton did not state how long he had been in the funeral-home business, he did state that Corner Stone's funeral-home business had existed for about 15 years. Chandler noted that his funeral home is located closer than is Corner Stone's funeral home to the cemetery (both Chandler's funeral home and the cemetery are in Rainsville). Chandler already has experience working at the cemetery. Pursuant to the agreement with Azar, during the receivership period, which began in 2009, Chandler's funeral home has been opening and closing graves and

16

maintaining the cemetery grounds. Chandler testified that he plans to have someone live in the house at the cemetery, which, he said, would deter vandalism (which has been a problem) and make maintaining the cemetery easier. Corner Stone did not make a similar offer. Chandler's experience in the community, the location of his funeral home, his recent dealings at the cemetery, and his plan to have someone live at the cemetery are factors supporting the trial court's decision. Although the LLC did not offer as much as Corner Stone in providing the markers already purchased in outstanding preneed contracts, Chandler did testify that the LLC would provide markers to preneed-contract holders at wholesale cost, diminishing the strength of the major selling point for Corner Stone.

We cannot say that the trial court exceeded its discretion in ordering the transfer of the corporation's assets to the LLC. Thus, we affirm.

AFFIRMED.

Moore, C.J., and Parker, Shaw, Main, and Wise, JJ., concur.

Murdock, J., concurs specially.

Stuart and Bolin, JJ., dissent.

1130604

MURDOCK, Justice (concurring specially).

I agree with the main opinion. I write separately to take further note of certain aspects of the evidence and the issues in this case.

As the main opinion observes, the asserted superiority of the offer of Corner Stone Funeral Chapel, Inc. ("Corner Stone"), was based on Corner Stone's plan to absorb the cost of all grave markers already purchased by holders of outstanding preneed contracts. This plan was in turn based on the ore tenus testimony of Corner Stone's owner, William Dalton -- indeed, his opinion testimony -- that included an "estimate" by him that only 30% of the preneed contracts Corner Stone would assume as part of the assets of Mountain View Gardens & Mausoleum, Inc., would include grave markers. On the basis of this opinion and estimate, Dalton's testimony was that Corner Stone could afford to provide the markers at a cost of $60,000.

First, the trial court was free to observe Dalton in his ore tenus testimony and to find him not to be a credible witness. On this basis alone, I do not believe that we can consider the evidence supporting Corner Stone's offer to be

18

"undisputed." The trial court thus could have found Corner Stone's plan to pay for all markers to be unreliable, and, as an appellate court, we are not in a position to second-guess the trial court's assessment of Dalton's testimony in this regard.

Aside from the possible credibility or weight concerns the trial court might have applied to Dalton's testimony, the main opinion notes that his testimony was directly disputed by other ore tenus testimony. In addition to the evidence noted in the main opinion, Keary Chandler, the owner of Rainsville Funeral Home and of MVMG, LLC ("the LLC"), testified that the number of markers that might have to be paid for was unknown and variable. In fact, Chandler estimated that the cost of the markers might be $150,000, as opposed to the $60,000 Dalton estimated. The trial court could have found the LLC's approach to the issue of the markers, and, by implication, the management of the contracts in general, to be more fiscally sound, and Corner Stone's proposed approach not to be credible. Janice Gilbert, a member of the MVMG Mausoleum Association, also questioned whether Corner Stone could afford to provide the markers it was promising to provide (suggesting

1130604

that the cost of the markers might have been what led the prior owner into insolvency in the first place).

Given the ore tenus standard of review applicable in this case, this Court can overturn the trial court's decision as to which company would better serve the interests of the preneed-contract holders in the long run only if it can determine as a matter of law that the seemingly more favorable proposal by Corner Stone was fiscally sound and based on reliable estimates. The testimony in favor of Corner Stone as to these questions was received by the trial court ore tenus and, thus, was subject to credibility and weight determinations by the judge and also was disputed by other ore tenus testimony. I therefore believe that we must affirm the trial court's judgment as to which company was likely to provide more beneficial and dependable service to the preneed-contract holders.

1130604

STUART, Justice (dissenting).

The majority opinion affirms the judgment of the DeKalb Circuit Court declaring Mountain View Memory Gardens & Mausoleum, Inc. ("the corporation"), to be insolvent and ordering its liquidation and the transfer of its assets to MVMG, LLC ("the LLC"), subject to certain conditions set forth in the trial court's order. However, because the corporation was certified by the Alabama Department of Insurance ("the Department") as a seller of preneed contracts pursuant to the Alabama Preneed Funeral and Cemetery Act, § 27-17A-1 et seq., Ala. Code 1975 ("the Preneed Act"), the trial court, in liquidating the corporation, was required to maximize financial value for those individuals holding outstanding preneed contracts. It is undisputed that Corner Stone Funeral Chapel, Inc. ("Corner Stone"), had submitted an offer to take over the operations of the corporation that would provide more financial value to those preneed-contract holders than the offer submitted by the LLC; accordingly, the trial court exceeded its discretion in transferring the corporation's assets to the LLC. I must therefore dissent.

21

In deciding whether the trial court should have accepted the proposal of the LLC or the proposal of Corner Stone, it must first be determined what criteria the trial court should have employed in evaluating the competing proposals. The LLC premises its argument on the assumption that the superior proposal is the proposal "better calculated and more likely to serve the interests of the stakeholders in [the cemetery]." The LLC's brief, p. 9. Accordingly, it summarizes its argument as follows:

> "The evidence showed that Corner Stone's offer provided less security and certainty for the future maintenance of the Mountain View [Memory Gardens] cemetery. The evidence further showed that Corner Stone's offer to provide grave markers at no further cost to holders of existing preneed contracts calling for the same was ill conceived and not economically feasible. There was introduced more than sufficient evidence from which the trial court rightly concluded that [the] LLC's offer was much less likely than Corner Stone's to result in the Mountain View [Memory Gardens] cemetery operation again falling into economic ruin, disrepair, and receivership, thus better serving the paramount interest of the cemetery stakeholders."

The LLC's brief, pp. 9-10. Thus, it is apparent that the LLC considers the "cemetery stakeholders" to be a broad group of people, including those with friends and family already interred or buried there and those people with plans to have

22

themselves -- or friends or family -- buried or interred there at some point in the future, regardless of whether that burial or internment is the subject of an existing preneed contract. The LLC argues that these stakeholders will be better served under its proposal because that proposal, the LLC claims, is better for the long-term economic health and viability of the cemetery.

In contrast, Corner Stone and Jim Ridling, the commissioner of the Department, argue that the superior proposal is the proposal that better serves a much more narrow class of stakeholders -- those who have purchased or who stand to benefit from outstanding preneed contracts sold by the corporation before it became insolvent.[4] They argue that the legislature's purpose in enacting the Preneed Act is evident from the language of the Act -- to provide a mechanism for protecting the investments of those Alabamians who choose to purchase preneed contracts. The various statutes constituting the Preneed Act, such as § 27-17A-10, Ala. Code 1975 (requiring sellers of preneed contracts to be certified), §

---

[4]Commissioner Ridling filed a brief on appeal; however, he is not named as an appellee on the notice of appeal. See supra note 2.

23

27-17A-13, Ala. Code 1975 (requiring such sellers to place a portion of the funds received from the sale of a preneed contract into trust), and § 27-17A-15, Ala. Code 1975 (authorizing the Department to examine the business of such sellers as often as is deemed necessary), Corner Stone and Commissioner Ridling argue, are all designed with that purpose in mind. I agree.

In a liquidation proceeding conducted pursuant to the Preneed Act, it is not the duty of a court, when considering multiple proposals to take over the operations of an insolvent seller of preneed contracts, to decide simply which proposal is better for a community or which proposal will result in a "better" run cemetery according to some undefined criteria. Rather, it is the duty of the court in such a situation to take the action that will better achieve the purpose of the Preneed Act -- to protect the financial interests of holders and beneficiaries of preneed contracts. That this is the purpose of the Preneed Act is manifested by the fact that it is the Department that supervises the liquidation of any certified seller of preneed contracts and that, pursuant to § 27-17A-17, Ala. Code 1975, it does so subject to § 27-32-1 et

24

seq., Ala. Code 1975, which chapter governs the rehabilitation, reorganization, conservation, and liquidation of an insolvent insurance business. Sections 27-32-37 through 27-32-41 of that chapter establish that, in the liquidation process, policyholders are preferred creditors and receive first priority during liquidation, subject to limited exceptions not applicable here. In the context of this case -- the liquidation of a certified seller of preneed contracts -- those individuals who have purchased preneed contracts are analogous to insurance policyholders inasmuch as they have purchased a contract, or "policy," providing for a future benefit. Accordingly, they are given preferred status, and the object of the liquidation process is to make them whole above any other interested party or claimant. For that reason, a trial court overseeing the liquidation process of a certified seller of preneed contracts should make its decisions based on how to best preserve value for those holders of preneed contracts. Protecting their investments is, after all, the reason the Preneed Act was enacted, and the relevant statutes should be "liberally construed" to achieve that goal. § 27-32-2, Ala. Code 1975.

However, although the relevant statutes are unambiguous, the majority opinion instead adopts the viewpoint that the trial court is empowered to simply decide what "is in the best interest of those concerned" and considers all "those concerned" to include "the general public [and] especially the local community." ___ So. 3d at ___. Although this broad class of people no doubt includes citizens who are "concerned" about the cemetery in the general sense that they take pride in the success and appearance of their community, their level of "concern" is insufficient from a legal perspective -- the Preneed Act, read in conjunction with the statutes governing insolvent insurance businesses, clearly indicates that the only "concern" that matters in a liquidation proceeding of a corporation such as the one here is the financial concern of those who hold preneed contracts. The majority opinion supports its rationale that the trial court was authorized to consider community sentiment in making its decision by citing § 27-17A-17(b), Ala. Code 1975, which allows the commissioner of the Department to seek liquidation of a certified seller of preneed contracts when the seller's continued operation would be hazardous to purchasers or beneficiaries of preneed

contracts, "or to the people of this state." However, § 27-17A-17(b) only sets forth the circumstances in which liquidation is authorized; it does not bear on how that liquidation should be accomplished or what factors should govern the liquidation process. Section 27-17A-17(a), Ala. Code 1975, does address that issue and provides that such a liquidation should be conducted under the supervision of the commissioner of the Department "who shall have all powers with respect thereto granted to the commissioner under Chapter 32 with respect to the liquidation of insurance companies." As already explained supra, it is evident from § 27-32-1 et seq. that policyholders, or preneed-contract holders in this context, are a preferred class, and a trial court should make its decisions during the liquidation process based on how to best preserve value for that preferred class -- not based on the desires of individuals who have no legally recognizable interest in the proceedings.

In this case, it is undisputed that the proposal put forth by Corner Stone promises more value to those holding outstanding preneed contracts sold by the corporation than the proposal submitted by the LLC. Denise Azar, the Department

employee responsible for the cemetery while it was under the Department's control, stated as much in her testimony and stated that, for that reason, the Department endorsed Corner Stone's proposal. Corner Stone's owner, William Dalton, also testified that Corner Stone's proposal was worth approximately $60,000 more to those holders of preneed contracts than the LLC's proposal. Even the LLC's sole member, Keary Chandler, when asked, willingly agreed that Corner Stone's proposal offered more benefits, and he in fact estimated those benefits to be worth far _more_ than $60,000:

> "Q. Well, what would be your estimate that it would cost him -- or cost you had you included that in your offer -- to furnish these markers?
>
> "A. I'd say more like $150,000.
>
> "Q. Okay. So, in your judgment then, the offer that he's made would benefit the contract holders -- assuming he carries those contracts out and does [what] he says he'll do -- would be valued at $150,000 more than what yours would be?
>
> "A. Yes."

The greater value of Corner Stone's proposal being established without dispute, it was due to be accepted. Any community sentiment in favor of keeping Mountain View Memory Gardens under the more "local" control of Rainsville Funeral Home,

28

which Chandler owns and operates, or any belief that Rainsville Funeral Home was in some way entitled to Mountain View Memory Gardens because it has been maintaining it under contract with the receiver since this process began is irrelevant.[5] The object of the applicable statutes is to make sure that those who purchased preneed contracts from the corporation receive what they purchased, and it is undisputed that Corner Stone's proposal is preferable in that regard.

We further note that although the record contains much speculation and insinuation that it will be impossible for Corner Stone to actually deliver what it promises in its proposal, there is no credible evidence that would indicate that. See Heisz v. Galt Indus., Inc., 93 So. 3d 918, 931 (Ala. 2012) (stating that "speculation is an insufficient basis upon which to support a judgment"). The competent

---

[5]It bears noting that the interests of those in the Rainsville community desiring to keep Mountain View Memory Gardens under local management are not necessarily aligned with those holding preneed contracts purchased from the corporation. That is, those Rainsville residents with future cemetery business might prefer to take care of it in Rainsville rather than make the approximately 17-mile drive to Corner Stone's offices in Ider; however, the holder of a preneed contract who stands to save $600 or more that he or she would otherwise have to spend on a grave marker that had already been paid for once would presumably be less hesitant to make that drive.

29

evidence in the record indicates that Corner Stone has successfully operated a funeral home since 1998 and has since grown its business to include three cemeteries. Moreover, Corner Stone has previously purchased a cemetery out of a Department-supervised receivership in what Dalton described as a "[v]ery similar situation," and its performance with regard to that cemetery has apparently been of sufficient quality that the Department, which examines, audits, and receives annual reports from certificate holders, is recommending Corner Stone to take over another insolvent cemetery and its preneed contracts.

In fact, the trial court itself recognized the absence of any evidence that would indicate Corner Stone could not provide the benefits promised in its proposal, stating that "no evidence is presented that Mr. Dalton, himself, couldn't follow through. Now Ms. Mince couldn't follow through, clearly, or we wouldn't be here. But what evidence is there that Mr. Dalton can't follow through?" Once the speculation is properly discarded, there is none. Indeed, it appears from the record that Corner Stone could have the financial assets of Wal-Mart Stores, Inc., and General Motors Company combined

1130604

-- the majority has not and cannot point to any evidence in the record that would indicate otherwise. The only testimony questioning Corner Stone's financial capability comes from a competitor and an individual who admittedly favors that competitor; however, that testimony has no factual basis and is accordingly nothing more than speculation. Ex parte Nathan Rodgers Constr., Inc., 1 So. 3d 46, 52 (Ala. 2008). Unfortunately, the majority has now elevated that speculation to the realm of competent evidence, notwithstanding this Court's longstanding precedent indicating that speculation is not evidence that can support a judgment. See, e.g., Heisz, 93 So. 3d at 931 (stating that "speculation is an insufficient basis upon which to support a judgment").

Moreover, the fact that we are reviewing the trial court's judgment under the ore tenus rule, as opposed to reviewing it de novo, should have no effect on the ultimate outcome. A judgment entered based on ore tenus testimony must still be supported by credible evidence, Joseph v. MTS Inv. Corp., 964 So. 2d 642, 646 (Ala. 2006), and statements that reflect speculation and lack of personal knowledge do not constitute credible evidence. Ex parte Professional Bus.

31

Owners Ass'n Workers' Comp. Fund, 867 So. 2d 1099, 1101-1102 (Ala. 2003). There is no evidence in the record indicating that the proposal made by the LLC will provide more financial benefits to the remaining preneed-contract holders than the proposal made by Corner Stone, nor is there any evidence -- as opposed to speculation -- in the record indicating that Corner Stone lacks the capability to fulfill the terms of its proposal. To the contrary, it is undisputed that the proposal made by Corner Stone offers greater value to preneed-contract holders, and those parties with some actual knowledge of Corner Stone's finances -- Dalton and the Department -- are satisfied that Corner Stone has the wherewithal to fulfill the terms of its proposal. It is accordingly clear that the goals and intents of the Preneed Act and relevant liquidation statutes will be more fully realized by the acceptance of the Corner Stone proposal. By affirming the judgment of the trial court in favor of the LLC, this Court is not deferring to the trial court's evaluation of the witnesses and evidence but is instead yielding to speculation. Beck v. Beck, 142 So. 3d 685, 695 (Ala. Civ. App. 2013). Accordingly, I must dissent. I would reverse the trial court's order and remand the cause

1130604

for the entry of a liquidation order directing the Department to transfer the corporation's assets to Corner Stone.

Bolin, J., concurs.